No. 25-13764-G

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendant-Appellant,

v.

OMAR SANTOS and AMANDA CLEMENTS,
individually, and on behalf of all others similarly situated,

Plaintiffs-Appellees,

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:19-cv-23084-KMW

## ANSWER BRIEF FOR PLAINTIFFS-APPELLEES

Peter Prieto
Matthew P. Weinshall
**Podhurst Orseck, P.A.**
2525 Ponce de Leon, Suite 700
Coral Gables, Florida 33134
305-358-2800

Dennis McCarty
Jonathan Raburn
**McCarty & Raburn PLLC**
2931 Ridge Road, Suite 101 #504
Rockwall, Texas 75032
214-296-9240

Roland Tellis
**Baron & Budd, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, California 91436
214-521-3605

Catherine H. Dorsey
**Baron & Budd, P.C.**
600 New Hampshire Ave., NW
Suite 10-A
Washington, DC 20037
202-333-4562

*Counsel for Plaintiffs-Appellees*

*Experian Information Solutions, Inc. v. Santos*, No. 25-13764

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In compliance with Local Rule 26.1-1, the undersigned certifies that the following is a complete list of the trial judges, all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporations that own 10% or more of the party's stock and other identifiable legal entities related to a party:

1. Aytch Lett, Enjoliqué – United States Magistrate Judge for the Southern District of Florida

2. Baron & Budd, P.C., Counsel for Appellees.

3. Central Source LLC, U.S.-based indirect subsidiary of Experian plc that is not wholly owned.

4. Clements, Amanda, Appellee.

5. Experian Holdings, Inc., parent company of Appellant Experian Information Solutions, Inc.

*Experian Information Solutions, Inc. v. Santos*, No. 25-13764

6. Experian Information Solutions, Inc., Appellant. Experian Information Solutions, Inc. is a wholly owned subsidiary of Experian Holdings, Inc., and the ultimate parent company is Experian plc. As ultimate parent company, Experian plc owns 100% of Experian Information Solutions, Inc.

7. Experian plc (EXPN:LON), indirect parent company of Experian Holdings, Inc. and ultimate parent company of Appellant Experian Information Solutions, Inc.

8. Garrett, Nathaniel P., Counsel for Appellant.

9. Healthcare Revenue Recovery Group, LLC d/b/a ARS Account Resolutions Services ("ARS"), former Appellant. According to its disclosure in the district court, no publicly owned company owns 10% or more of the stock of ARS.

10. Johnson, Daniel Paul, Counsel for Appellant.

11. Jones Day, Counsel for Appellant.

12. Mann, Jonas P., Counsel for Appellees.

13. McCarty, Dennis, Counsel for Appellees.

14. McCarty & Raburn PLLC, Counsel for Appellees.

C-2 of 4

*Experian Information Solutions, Inc. v. Santos*, No. 25-13764

15. New Management Services LLC, U.S.-based indirect subsidiary of Experian plc that is not wholly owned.

16. Online Data Exchange LLC, U.S.-based indirect subsidiary of Experian plc that is not wholly owned.

17. Opt-Out Services LLC, U.S.-based indirect subsidiary of Experian plc that is not wholly owned.

18. Perez Soto, Ana Maria Cristina, Counsel for Appellant.

19. Podhurst Orseck, P.A., Counsel for Appellees.

20. Prieto, Peter, Counsel for Appellees

21. Raburn, Jonathan, Counsel for Appellees.

22. Santos, Omar, Plaintiff/Appellee.

23. Silverio, Dayron, Counsel for Appellees.

24. Tamburelli, Adam, Counsel for Appellees.

25. Taylor, William, Counsel for Appellant.

26. Tellis, Roland, Counsel for Appellees.

27. VantageSource Solutions LLC, U.S.-based subsidiary of Experian plc that is not wholly owned.

28. Vogt, John, Counsel for Appellant.

*Experian Information Solutions, Inc. v. Santos*, No. 25-13764

29. Weinshall, Matthew P., Counsel for Appellees

30. Williams, Hon. Kathleen M., United States District Judge.

# STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees would welcome the opportunity to participate in an oral argument and agree with Defendant-Appellant that the important issues raised in this case warrant the additional attention that oral argument affords.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................... 1

ISSUES ON APPEAL ................................................................................. 3

STATEMENT OF THE CASE .................................................................... 4

    I.    Factual and Procedural Background. ............................................ 4

    II.   Dispute Resolution Provisions. .................................................... 9

        A.    2021 Version. ...................................................................... 9

        B.    2023 Version ..................................................................... 10

SUMMARY OF ARGUMENT .................................................................. 11

ARGUMENT ........................................................................................... 15

    I.    The District Court Correctly Decided the Question of
        Litigation-Conduct Waiver. ...................................................... 15

        A.    The 2023 Version Is Inoperative. ..................................... 17

            1.    The Plain Language of the 2023 Version Makes It
                Inoperative. ............................................................ 17

            2.    Eleventh Circuit Precedent on Mid-Litigation Court-
                Evicting Provisions Makes the 2023 Version
                Inoperative. ............................................................ 28

            3.    Clements Never Accepted the 2023 Version. ................... 32

        B.    The Operative 2021 Version Did Not Delegate
            Questions of Litigation-Conduct Waiver to the
            Arbitrator. ........................................................................ 34

C.      The Text of the FAA Requires Courts to Decide
Questions of Litigation-Conduct Waiver in This
Procedural Posture.................................................................51

II.     The District Court Correctly Decided That Experian
Waived Its Right To Compel Arbitration. ..................................59

CONCLUSION ......................................................................................66

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Al-Nahhas v. 777 Partners LLC,*

   129 F.4th 418 (7th Cir. 2025) .......................................................53, 65

*Arriaga v. Fla. Pac. Farm, L.L.C.,*

   305 F.3d 1228 (11th Cir. 2002)...........................................................26

*AT&T Mobility LLC v. Concepcion,*

   563 U.S. 333 (2011) .............................................................................15

*Attix v. Carrington Mortgage Services, LLC,*

   35 F.4th 1284 (11th Cir. 2022) ................................................40, 42, 43

*Breadeaux's Pisa, LLC v. Beckman Bros. Ltd.,*

   83 F.4th 1113 (8th Cir. 2023) ..............................................................54

*Buruk v. Experian Info. Sols., Inc.,*

   732 F. Supp. 3d 165 (D. Mass. 2024) ..................................................37

*Calderon v. Sixt Rent a Car, LLC,*

   5 F.4th 1204 (11th Cir. 2021) ..............................................................17

*Carraway v. Armour & Co.,*

   156 So.2d 494 (Fla. 1963) ...................................................................48

iv

*Coinbase, Inc. v. Bielski,*

   599 U.S. 736 (2023) ................................................................ 66

*Coinbase, Inc. v. Suski,*

   602 U.S. 143 (2024) ......................................... 15, 16, 41, 63

*Collado v. J. & G. Transp., Inc.,*

   820 F.3d 1256 (11th Cir. 2016) .......................................... 64

*Coronel v. Bank of America, N.A.,*

   No. 19-cv-8492, 2022 WL 3443985 (D.N.J. Aug. 17, 2022) ................. 38

*Craig v. Discover Bank,*

   No. 21-CV-1407, 2022 WL 2119125 (S.D. Cal. June 13, 2022) ............ 28

*Dasher v. RBC Bank (USA),*

   745 F.3d 1111 (11th Cir. 2014) ......................... 29, 30, 31, 62

*Davis v. Legal Services Alabama, Inc.,*

   19 F.4th 1261 (11th Cir. 2021) ............................................ 66

*Dear v. Q Club Hotel, LLC,*

   933 F.3d 1286 (11th Cir. 2019) .......................................... 25

*E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas,*

   551 F.2d 1026 (5th Cir. 1977) ............................................ 52

*Ehleiter v. Grapetree Shores, Inc.,*

   482 F.3d 207 (3d Cir. 2007) .............................. 36, 39, 40, 41, 43, 49, 53

*Excelsior Ins. Co. v. Pomona Park Bar & Package Store,*

   369 So. 2d 938 (Fla. 1979) .................................................................. 25

*First Options of Chicago, Inc. v. Kaplan,*

   514 U.S. 938 (1995) ...................................................................... 15, 44

*Garcia v. Wachovia Corp.,*

   699 F.3d 1273 (11th Cir. 2012) ........................................................... 61

*Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.,*

   994 F.3d 1181 (10th Cir. 2021) ........................................................... 38

*Grigsby & Associates, Inc. v. M Sec. Inv.,*

   664 F.3d 1350 (11th Cir. 2011) ............................... 39, 44, 45, 54, 55, 56

*Gutierrez v. Wells Fargo Bank, NA,*

   889 F.3d 1230 (11th Cir. 2018) ................................. 1, 45, 59, 61, 62, 65

*Halcon International, Inc. v. Monsanto Australia Limited,*

   446 F.2d 156 (7th Cir. 1971) .............................................................. 53

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*

   586 U.S. 63 (2019) ............................................................. 15, 41, 56, 57

*Hilton v. Midland Funding, LLC,*

   687 Fed. Appx. 515 (6th Cir. 2017) ................................................. 39, 40

*Howsam v. Dean Witter Reynolds, Inc.,*

   537 U.S. 79 (2002) .......................................................................... 39, 42

*In re Checking Account Overdraft Litig. MDL No. 2036,*

   674 F.3d 1252 (11th Cir. 2012) ............................................................ 46

*In re Checking Account Overdraft Litig. MDL No. 2036,*

   685 F.3d 1269 (11th Cir. 2012) ............................................................ 18

*In Re Chrysler Pacifica Fire Recall Products Liab. Litig.,*

   143 F.4th 718 (6th Cir. 2025) ............................................. 35, 40, 41, 49

*In re Key West Jet Ski, Inc.*

   No. 4:25-CV-10067, 2026 WL 747112 (S.D. Fla. Mar. 17, 2026) ......... 37

*In re Piazza,*

   719 F.3d 1253 (11th Cir. 2013) ............................................................ 47

*Ivax Corp. v. B. Braun of Am., Inc.,*

   286 F.3d 1309 (11th Cir. 2002) ............................................................ 52

*Jackson v. Shakespeare Found., Inc.,*

   108 So. 3d 587 (Fla. 2013) ................................................................... 18

vii

*Jarecki v. G. D. Searle & Co.*,

367 U.S. 303 (1961) ....................................................................... 47

*Jones v. Waffle House, Inc.*,

866 F.3d 1257 (11th Cir. 2017) ................................................ 32, 45

*JPay, Inc. v. Kobel*,

904 F.3d 923 (11th Cir. 2018) ................................................. 40, 44

*KRG Oldsmar Project Co., LLC v. CWI, Inc.*,

358 So. 3d 464 (Fla. 2d DCA 2023) ............................................... 25

*Krinsk v. SunTrust Banks, Inc.*,

654 F.3d 1194 (11th Cir. 2011) ..................................................... 63

*Lamonaco v. Experian Info. Sols., Inc.*,

141 F.4th 1343 (11th Cir. 2025) ............ 19, 34, 35, 43, 49, 54, 55, 56, 66

*Lamps Plus, Inc. v. Varela*,

587 U.S. 176 (2019) ................................................................. 18, 50

*Liu v. Equifax Info. Servs., LLC*,

No. 22-cv-10638, 2024 WL 308089 (D. Mass. Jan. 26, 2024) .............. 37

*Marie v. Allied Home Mortgage Corp.*,

402 F.3d 1 (1st Cir. 2005) ..................... 37, 38, 40, 41, 42, 43, 48, 49, 53

*Martinez v. Carnival Corp.*,

   744 F.3d 1240 (11th Cir. 2014)..............................................................46

*Marx v. General Revenue Corp.*,

   568 U.S. 371 (2013) ..............................................................................46

*McCullough v. MHMR of Tarrany Cty.*,

   No. 4:25-CV-00901, 2026 WL 856672 (N.D. Tex. Mar. 5, 2026),

   *report and recommendation adopted*, No. 4:25-CV-00901, 2026

   WL 855843 (N.D. Tex. Mar. 27, 2026) ..................................................37

*Merritt Island Woodwerx, LLC v. Space Coast Credit Union*,

   137 F.4th 1268 (11th Cir. 2025).............................................................52

*MetroPCS Communications, Inc. v. Porter*,

   273 So. 3d 1025 (Fla. 3d DCA 2018) .....................................................34

*Montejo v. Louisiana*,

   556 U.S. 778 (2009) ..............................................................................64

*Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n*

   *(Luxembourg)*,

   62 F.3d 1356 (11th Cir. 1995)..........................................................51, 59

*Morgan Stanley & Co. LLC v. Couch*,

   659 Fed. Appx. 402 (9th Cir. 2016) ..................................................36, 49

*Morgan v. Sundance, Inc.*,

  596 U.S. 411 (2022) ..............................................................15, 52, 58

*Myers v. Papa Texas, LLC*,

  749 F. Supp. 3d 1165 (D.N.M. 2024)......................................................37

*N.L.R.B. v. SW Gen., Inc.*,

  580 U.S. 288 (2017) .......................................................................46, 47

*N-Bar Trade, Inc. v. Amazon.com Services LLC*,

  807 F. Supp. 3d 11 (D.D.C. 2025)..........................................................37

*New Prime Inc. v. Oliveira*,

  586 U.S. 105 (2019) .......................................................................53, 57

*Parm v. Nat'l Bank of California, N.A.*,

  835 F.3d 1331 (11th Cir. 2016)...............................................................18

*Parnell v. CashCall, Inc.*,

  804 F.3d 1142 (11th Cir. 2015)...............................................................46

*Pendergast v. Sprint Nextel Corp.*,

  592 F.3d 1119 (11th Cir. 2010)...............................................................32

*People's Tr. Ins. Co. v. Lamolli*,

  352 So. 3d 890 (Fla. 4th DCA 2022)......................................................24

*Perry v. Exeter Fin. LLC,*

   No. CV-25-01552, 2026 WL 538300 (D. Ariz. Feb. 26, 2026) ............... 37

*Plaintiff's Shareholders Corp. v. S. Farm Bureau Life Ins. Co.,*

   486 Fed. Appx. 786 (11th Cir. 2012) .......................................... 17, 37, 38

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*

   388 U.S. 395 (1967) ............................................................................. 56

*Rent-A-Center, West, Inc. v. Jackson,*

   561 U.S. 63 (2010) ............................................................ 16, 22, 42, 63

*S & H Contractors, Inc. v. A.J. Taft Coal Co.,*

   906 F.2d 1507 (11th Cir. 1990) ........................................................... 62

*Samantar v. Yousuf,*

   560 U.S. 305 (2010) ............................................................................ 47

*Santos v. Healthcare Revenue Recovery Group, LLC.,*

   90 F.4th 1144 (11th Cir. 2024) ............................................................. 7

*SCG Harbourwood, LLC v. Hanyan,*

   93 So. 3d 1197 (Fla. 2d DCA 2012) .................................................... 27

*Sink v. Aden Enterprises, Inc.,*

   352 F.3d 1197 (9th Cir. 2003) ............................................................. 56

*Sitzer v. Nat'l Ass'n of Realtors,*

    12 F.4th 853 (8th Cir. 2021) ....................................................... 54

*Slaten v. Experian Info. Sols., Inc.,*

    No. 21-cv-09045, 2023 WL 6890757 (C.D. Cal. Sept. 6, 2023) ............. 38

*Slater v. United States Steel Corp.,*

    871 F.3d 1174 (11th Cir. 2017) ................................................... 55

*Smith v. Experian Info. Sols., Inc.,*

    No. 22-cv-06471, 2023 WL 6057377 (D.N.J. Sept. 14, 2023) .............. 38

*Smith v. Marcus & Millichap, Inc.,*

    991 F.3d 1145 (11th Cir. 2021) ................................................... 51

*Southwest Airlines Co. v. Saxon,*

    596 U.S. 450 (2022) ................................................................. 22

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*

    559 U.S. 662 (2010) ........................................................... 18, 50

*Terminix Intern. Co., LP v. Palmer Ranch Ltd. P'ship,*

    432 F.3d 1327 (11th Cir. 2005) ................................................ 42, 43

*United States v. Tigua,*

    963 F.3d 1138 (11th Cir. 2020) ................................................... 22

*Vine v. PLS Fin. Services, Inc.*,

   689 Fed. Appx. 800 (5th Cir. 2017) ................................................35, 49

*Vitacost.com, Inc. v. McCants*,

   210 So. 3d 761 (Fla. 4th DCA 2017).......................................................33

*Wright v. Universal Mar. Serv. Corp.*,

   525 U.S. 70 (1998) ..................................................................................49

**Statutes**

15 U.S.C. § 1681 ............................................................................................ 1

9 U.S.C. § 2 ...................................................................................................56

9 U.S.C. § 3 ........................................................ 51, 52, 53, 54, 55, 57, 58

9 U.S.C. § 4 ...................................................................................................56

9 U.S.C. § 6 ...................................................................................................58

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law: The

   Interpretation of Legal Texts (2012) ........................................22, 25, 46

Meriam-Webster Online Dictionary ........................................................33

## **INTRODUCTION**

The waiver doctrine is meaningless if a party can move to dismiss, move for summary judgment, pursue document and deposition discovery, move to exclude experts, oppose class certification, argue an appeal, and then—five years into the litigation, only after an appellate court has thrown out its meritless arguments—force its opponent into arbitration. The gamesmanship of such a move is breathtaking. *See Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018) ("Acting in a manner inconsistent with one's arbitration rights and then changing course mid-journey smacks of outcome-oriented gamesmanship played on the court and the opposing party's dime."). Yet that is precisely what Appellant Experian Information Solutions, Inc. seeks to do here.

Eleventh Circuit precedent unequivocally holds that such inequitable conduct waives any right to compel arbitration. So, Experian makes no effort to dispute that it has waived any right to arbitrate the claims of Plaintiffs-Appellees Omar Santos and Amanda Clements, brought in 2019 on behalf of themselves and a class of 2.1 million consumers, for Experian's willful violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"). Instead, Experian advances a

1

convoluted procedural attack: it contends that the district court should not have made the waiver decision, and that an arbitrator, perhaps less concerned with Eleventh Circuit authority on waiver, should have decided instead.

But that argument fails for three separate reasons, each warranting affirmance. First, even if such a question could be delegated to an arbitrator, it was not so delegated here. The agreements between Plaintiffs and Experian's affiliate in place when this litigation began in 2019 did not clearly and unmistakably delegate the unique question of litigation-conduct waiver to an arbitrator, and the plain language of the 2023 agreement that Experian now invokes—to which one Plaintiff never agreed and Eleventh Circuit precedent independently renders inoperable—precludes its application here. Second, the plain text of the Federal Arbitration Act ("FAA") requires a court to decide whether a party, through litigation conduct, has waived its right to compel arbitration. Third, Experian's waiver of the right to arbitrate Plaintiffs' claims, which it does not challenge, also waived the right to arbitrate threshold issues, such as litigation-conduct waiver.

2

For good reason, courts have placed the question of litigation-conduct waiver in a different category than other issues for delegation purposes. Animated by the judiciary's inherent authority to manage abusive forum shopping, those circuit courts that have permitted such delegation at all in published decisions have required an express reference to litigation-conduct waiver. There is no such express reference in the operative agreement here, so Experian's delegation argument should be rejected. As Experian does not challenge the district court's ultimate conclusion that it waived its right to compel arbitration, the district court's order should be affirmed.

## **ISSUES ON APPEAL**

1. Whether the district court was permitted to decide that Experian's litigation of this matter for more than five years waived any right to compel arbitration.

2. Whether Experian's litigation of this case in court for more than five years waived any right to compel arbitration.

3

## STATEMENT OF THE CASE

### I.   Factual and Procedural Background.

On July 12, 2019, Plaintiff Amanda Clements enrolled for a product called CreditWorks offered by an Experian affiliate. (A178 ¶ 8.)[1] During the enrollment process, Clements agreed to the arbitration provision in the Terms of Use. (*Id.*; A290–91.) Twelve days later, on July 24, 2019, Clements and Plaintiff Omar Santos filed their Class Action Complaint in this case, but it has nothing to do with CreditWorks. (A35.)

Rather, Plaintiffs allege that Experian, a consumer credit reporting agency, disseminated to third parties credit reports about Plaintiffs and the proposed class of 2.1 million consumers with inaccurate information, in willful violation of the FCRA. (*Id.*) The inaccuracy, common to all class members and stemming from a single setting in Experian's computer system, created the misleading impression that some of their debts entered collections status more recently than they really did, which materially and negatively reflected their creditworthiness. (Doc.134 at

---

[1] "A_" refers to the Appendix and page number. "Doc. __" refers to the specified docket number, and if applicable, page number, for documents outside the Appendix. "Br. __" refers to Experian's initial brief.

Ex. 11 at Nos. 16–17; Doc.134 at Ex. 12 at 18:2–19:9; 35:13–18; Doc.134 at Ex. 13 at 42:3–22. Doc.134 at Ex. 10 at 3–6, 12–16, 19; Doc.134 at Ex. 9 at 52:16–20; 53:15–19; 64:25–65:18.)

Experian moved to dismiss the Complaint on September 10, 2019, without mentioning arbitration. (Doc.29.) Later that month, on September 27, 2019, Experian submitted a Joint Scheduling Report pursuant to Rule 26(f), without mentioning arbitration and instead requesting a ten-day jury trial. (Doc.32.)

Approximately six months later, on March 20, 2020, Experian filed an Answer to Plaintiffs' Complaint. (A65.) In its Answer, Experian asserted fourteen affirmative defenses, none of which mentioned arbitration. (A79–A82.) Meanwhile, discovery was underway, and the parties propounded and responded to written discovery requests, produced documents, engaged in motion practice relating to discovery, and conducted depositions of Plaintiff Clements, Plaintiff Santos, Experian's corporate designee, and the parties' experts. (*See, generally,* Doc.134; Doc.44.) Experian never once mentioned its intent to arbitrate during that time.

On April 30, 2020, Experian joined a Motion to Amend Certain Pre-Trial Deadlines, which noted that the parties had held multiple meet-and-confer teleconferences to discuss pending discovery issues, and that the "limited extension of only certain pre-trial deadlines will not affect the *trial* date." (Doc.52 (emphasis added).)

On September 14, 2020, Experian filed a Motion for Summary Judgment, which did not reference arbitration. (Doc.59.) Two days later, the parties participated in a mediation. (Doc.62.) After failing to reach a settlement, the parties continued to litigate this case.

Meanwhile, on February 20, 2021—during the litigation—Santos also enrolled in CreditWorks. (A175 ¶ 3.) During the enrollment process, Plaintiff Santos agreed to the arbitration provision in the Terms of Use. (*Id.*) Because the relevant dispute resolution provisions are the same in the version to which Santos agreed in 2021 and the version to which Clements agreed in 2019, both versions will be referred to collectively, for the sake of simplicity, as the "2021 Version."

Almost two months after Santos enrolled in CreditWorks, on April 5, 2021, Experian filed a motion for leave to file its second Motion for

Summary Judgment, as well as a motion to exclude Plaintiffs' expert, again without mentioning arbitration. (Doc.90; Doc.92.)

On the same day, Plaintiffs moved for class certification. (Doc.86.) Experian responded on May 3, 2021, without mentioning arbitration. (Doc.107.) And on November 12, 2021, while preparing for trial, the parties filed motions in limine, a pretrial stipulation, and joint proposed jury instructions, and Experian made no mention of arbitration therein. (Doc.154; Doc.156; Doc.159; Doc.160.)

On December 21, 2021, the district court denied Plaintiffs' initial motion for class certification. (A184.) This Court permitted Plaintiffs to file an interlocutory appeal under Fed. R. Civ. P. 23(f), and on January 12, 2024, reversed the district court's decision, holding that Plaintiffs have standing and that the district court's interpretation of the FCRA, upon which its denial of class certification rested, was incorrect. *Santos v. Healthcare Revenue Recovery Group, LLC.*, 90 F.4th 1144, 1151–55 (11th Cir. 2024).

While the appeal was pending, on April 10, 2023, Experian emailed Clements directly, without alerting her counsel or the court, stating that the CreditWorks Terms of Use had been updated on April 3, 2023. (A180

7

¶ 14.) Clements attested that she does not recall ever reading or receiving an email notification that the CreditWorks Terms of Use Agreement had been updated, never agreed to the April 3, 2023 update to that Agreement, and did not log into or otherwise visit the CreditWorks website on or after April 3, 2023. (A337 ¶¶ 1–3.) Since the dispute resolution terms of the April 3, 2023 version of the Terms of Use Agreement differ from the 2021 Version, it will be separately referenced as the "2023 Version."

Shortly thereafter, on June 2, 2023, Experian sent Santos a marketing email, again without alerting his attorney or the court (Doc.270-1 at 99:19–100:10; Doc.270-9), and he enrolled the same day in Boost, which is a feature within a CreditWorks membership covered by the same Experian agreement, not a separate product (A176 ¶ 6; Doc.270-1 at 76:5–23). When Santos signed up for the additional Boost feature, he clicked "Accept" on a screen with a link to the 2023 Version, but the screen did not state that the 2023 Version's dispute resolution provisions would apply to a currently pending lawsuit. (A176 ¶ 6.)

Over the next six months, while the appeal remained pending, Experian joined in the filing of four Status Reports in the district court,

8

none of which referenced arbitration. (Doc.209; Doc.211; Doc.213; Doc.219.) Nor did Experian alert this Court to an interest in arbitration while it decided the interlocutory appeal.

Only after this Court rejected Experian's standing and statutory arguments, almost five years into the litigation, on March 13, 2024, did Experian first mention the possibility of arbitration as to Santos exclusively. (A137.) And it was not until one year later, almost six years into the litigation, on February 24, 2025, that Experian first moved to compel arbitration as to both Santos and Clements. (A153.)

## II.    Dispute Resolution Provisions.

### A.    2021 Version.

The 2021 Version includes a section titled "**AMENDMENTS**," which describes how "[t]his Agreement may be updated from time to time," and then provides: "However, no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing." (A188.)

In the section titled "**DISPUTE RESOLUTION BY BINDING ARBITRATION**," the 2021 Version includes an arbitration agreement

and delegation provision that never mentions waiver by litigation conduct. (A191–94.)

### B.    2023 Version

The 2023 Version contains a section titled "**NOTICE TO EXISTING CUSTOMERS**," which explains, in relevant part: "Unless the parties agree in writing, the modifications to the dispute resolution provisions in the Prior Version as reflected in this Agreement shall not apply to any lawsuit currently pending in any court or in any arbitration currently pending before the AAA or any other arbitration provider." (A235.)

In another "**AMENDMENTS**" section, the 2023 Version reiterates that "no amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing." (A236.)

And in the "**DISPUTE RESOLUTION BY BINDING ARBITRATION**" section, the 2023 Version includes an arbitration provision, as well as a delegation provision stating that "whether you or

10

ECS, through litigation conduct or otherwise, waived the right to arbitrate" is an issue "for the arbitrator to decide." (A241.)

## SUMMARY OF ARGUMENT

After choosing to litigate in federal court for more than five years—filing dispositive motions, pursuing discovery, opposing class certification, and arguing an interlocutory appeal—Experian maintains that it should be allowed, now that its litigation strategy failed, to force Plaintiffs out of court and into arbitration. That is not a good-faith application of the FAA. It is gamesmanship. And the district court correctly rejected it.

Experian does not dispute the core point that its litigation conduct waived any right to arbitrate. Instead, it seeks to sidestep the issue altogether by insisting that the district court lacked authority to decide it. But that threshold argument fails.

First, the district court correctly determined that the 2023 Version on which Experian depends is inoperative. The contract's plain language says precisely that. It requires the parties to expressly agree in writing that the 2023 Version's modifications to the dispute resolution provisions apply to lawsuits already pending in court. No such written agreement

11

exists. That should end the inquiry. But Experian goes to great lengths to evade the text it drafted, trying to disregard provisions as surplusage and rewrite the agreement. The district court correctly refused to do any of that.

Even if the contract's text had not disabled the 2023 Version, Eleventh Circuit precedent independently would have. In similar circumstances, this Court refused to allow a defendant to impose a court-evicting mid-litigation arbitration agreement on a plaintiff when the defendant bypassed the plaintiff's counsel, which is precisely the maneuver Experian attempted here. And as to Clements in particular, the record independently defeats Experian's claim that she is bound by the 2023 Version, because there is no evidence she even saw the 2023 update, much less accepted it. So, the 2023 Version is irrelevant.

With the 2023 Version set aside, Experian's delegation argument collapses. The operative 2021 Version nowhere says that litigation-conduct waiver may be decided by an arbitrator. At worst, waiver by litigation conduct is presumptively for courts, and only clear and unmistakable language can overcome that presumption. The 2021 Version contains no such language—indeed, no reference to litigation-

conduct waiver at all. That omission is dispositive. The published appellate decisions addressing this question have recognized that generic references to validity, enforceability, scope, or even arbitrability do not clearly and unmistakably delegate the distinct question whether a party has forfeited arbitration by abusing the judicial process. That makes perfect sense. Litigation-conduct waiver is not just another "arbitrability" issue; it arises from conduct in court and implicates the judiciary's authority to police abusive forum shopping and procedural gamesmanship. Silence and ambiguity are not enough to strip courts of that authority.

The Court should also affirm the district court's decision for an independent statutory reason. Section 3 of the FAA permits a stay in favor of arbitration only if the applicant is not "in default in proceeding with such arbitration." A court therefore must determine for itself whether the applicant is in default before granting a stay. The Seventh and Eighth Circuits have recognized as much, and their reasoning is compelling. Experian itself acknowledged that this statutory issue remains open for this Court, which should adhere to the plain language of the statute.

13

And even aside from the delegation question, this Court should affirm on the additional ground that Experian's five years of litigation waived its right to invoke both the arbitration agreement and the delegation clause. The severability of a delegation clause does not require the effective nullification of the waiver doctrine.

In the end, this appeal is an effort to escape the consequences of Experian's own strategic choices. It chose court when it thought court suited it. It stayed silent about arbitration while pressing its merits arguments and while it held an advantage against Plaintiffs on class certification. Only after this Court rejected its position did Experian suddenly discover a desire to arbitrate. That is exactly the sort of outcome-driven maneuver the waiver doctrine exists to prevent. The district court correctly refused to indulge it, and its order should be affirmed.

## ARGUMENT

### I.    The District Court Correctly Decided the Question of Litigation-Conduct Waiver.

"[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Under the FAA, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted). But the "policy favoring arbitration" reflected in the FAA, *id.*, "does not authorize federal courts to invent special, arbitration-preferring procedural rules," *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

The law recognizes that "parties can form multiple levels of agreements concerning arbitration." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). "At a basic level, parties can agree to send the merits of a dispute to an arbitrator." *Id.* At another level, parties can "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). Such an agreement for "an arbitrator to decide

whether a dispute is subject to arbitration—*i.e.*, its arbitrability—'is simply an additional, antecedent agreement . . ., and the FAA operates on this additional arbitration agreement just as it does on any other.'" *Coinbase*, 602 U.S. at 148 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010)) (alterations in original).

Critically, when parties dispute which of multiple delegation provisions to apply, "a court must decide which contract governs." *Id.* at 152. "To hold otherwise," the Supreme Court has explained, "would be to impermissibly elevate a delegation provision over other forms of contract." *Id.* (quotations and alterations omitted).

The district court correctly applied these principles in first deciding that the 2021 Version, not the 2023 Version, governs, based on its plain language (A374–78.) As explained below, its decision should be affirmed for that reason and two additional, independent reasons: Eleventh Circuit precedent that bars such a mid-litigation, court-evicting tactic when a sophisticated defendant intentionally bypasses a represented plaintiff's attorney; and the record establishes that Plaintiff Clements never agreed to the 2023 Version.

16

Having correctly determined that the 2021 Version governs, the district court also correctly concluded that the 2021 Version did not delegate the question of litigation-conduct waiver to an arbitrator. (A378–82.) Its reasoning aligns with every circuit court that has decided the issue in a precedential opinion, as well as this Court in an unpublished opinion, *Plaintiff's Shareholders Corp. v. S. Farm Bureau Life Ins. Co.*, 486 Fed. Appx. 786, 790 (11th Cir. 2012).

In addition, as explained below, the district court's conclusion is correct for the independent reason that the FAA's text prevents parties from delegating the question of litigation-conduct waiver to an arbitrator under these circumstances, a conclusion reached by the Seventh and Eighth Circuits.

## A.    The 2023 Version Is Inoperative.

### 1.    The Plain Language of the 2023 Version Makes It Inoperative.

Like any other contract, the plain language of an arbitration agreement is what matters. *See Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1208 (11th Cir. 2021) (holding that interpretation of an arbitration agreement "turns on the 'intent of the parties to [the] contract, as manifested in the plain language of the arbitration provision and contract

17

itself'") (quoting *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013)).[2] And despite the FAA, "courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." *Parm v. Nat'l Bank of California, N.A.*, 835 F.3d 1331, 1335 (11th Cir. 2016) (quotations omitted).

As the district court concluded (A374–78), Experian's argument for applying the 2023 Version depends on ignoring or twisting the plain language of the agreement—precisely what the law prohibits. The 2023 Version itself provides, in a clear "Notice to Existing Customers," as both Plaintiffs were, that "[u]nless the parties agree in writing, the modifications to the dispute resolution provisions in the Prior Version as reflected in this Agreement *shall not apply to any lawsuit currently pending in any court.*" (A235 (emphasis added).)[3] Reinforcing that

---

[2] Experian contends (Br. at 26), and Plaintiffs agree, that Florida law applies to contract formation and interpretation. *See In re Checking Account Overdraft Litig. MDL No. 2036*, 685 F.3d 1269, 1275 n.6 (11th Cir. 2012). But "the FAA provides the default rule for resolving certain ambiguities in arbitration agreements," *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019), including whether the parties have consented to an arbitrator having certain authority, *see id.* at 184. *Accord Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010).

[3] While neither Plaintiff agreed to apply any subsequent version of Experian's terms to this lawsuit, the delegation provision of the February

18

protection, the 2021 Version, in the Amendments section, explains that Experian may update the terms "from time to time," but "no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties agree otherwise in writing." (A188.)

The parties, of course, have not agreed in writing to apply the modifications of the 2023 Version, including its delegation provision, to this pending lawsuit. (Doc.270 at 84:25–85:4 (Q. "Do you have any record of Santos or Clements expressly agreeing and writing to change the dispute resolution provisions of this agreement? A. No.").) So, under the plain language of the 2023 Version, the prior version—the 2021 Version—is operative, just as the district court reasoned. (A376–78.)[4]

---

2, 2023 version, which immediately preceded the 2023 Version on which Experian now relies, contained the same delegation clause as that 2021 Version. *Compare* A193 *with* Doc.270-3 at EXP-SANTOS-004858.

[4] The Court did not decide this issue in *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1349 (11th Cir. 2025), and Experian does not contend otherwise. Even though the Court interpreted the 2023 Version there, the *Lamonaco* plaintiff, the Court was careful to note, unlike Plaintiffs here, did "not dispute the [2023 Version's delegation] clause's validity." *Id.* Undersigned counsel represented the *Lamonaco* plaintiff on

The contractual language is clear, and the facts are undisputed, so the analysis should end there, with the 2023 Version disregarded. But Experian is unwilling to live with the consequences of the language it drafted, tacitly conceding that the 2023 Version is essential to its appeal, since the 2021 Version does not accomplish the delegation it requires. Experian's extraordinary efforts to avoid the natural implications of its own contractual language are, as the district court found, "muddled" (A377) and stretch credulity.

Experian remarkably contends that the "Notice to Existing Customers" carveout for "modifications to the dispute resolution provisions in the Prior Version" (A235) somehow applies to the arbitration agreement but not the delegation clause within the arbitration agreement. (Br. at 33.) That is not what the contract says.

The carveout is not limited to a particular arbitration provision and does not exclude the delegation provision from its reach. Instead, it applies, without limitation, to all "modifications to the dispute resolution *provisions* in the Prior Version" (A235 (emphasis added)), and both the

---

her petition for rehearing but was not involved in her case before the district court or on the initial appeal.

arbitration provision and the delegation provision are housed in the same "DISPUTE RESOLUTION BY BINDING ARBITRATION" section (A238). There is no other section of the agreement with "dispute resolution" in its name, so the only reasonable way to read the "Notice to Existing Customers" carveout is that it applies to the provisions within the "DISPUTE RESOLUTION BY BINDING ARBITRATION" section, meaning both the arbitration provision and the delegation provision.

The "Amendments" section of the 2021 Version reinforces this point. After requiring written consent to "retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement," the section provides that "[i]n all other respects, any modification or update to the arbitration provision shall be governed by subsection (g) of the Agreement's 'Dispute Resolution By Binding Arbitration' Section below." (A188.) The contract, therefore, uses the narrower term "arbitration provision" when referring to modifications not involving pending litigation, but uses the broader term "dispute resolution provisions"— that is, all provisions in the section, not just the arbitration provision— when describing the carveout for pending litigation, for which written consent is required. As the district court recognized, this triggers the

21

"meaningful-variation canon," which forecloses Experian's attempt to narrow "dispute resolution provisions" to exclude the delegation clause. (A377 (citing *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458–59 (2022) (discussing application of the "meaningful-variation canon" to interpret a broader phrase, "all employment contracts" differently from a narrower one, "contracts involving 'transportation workers'") (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)); *United States v. Tigua*, 963 F.3d 1138, 1143 (11th Cir. 2020) (applying the meaningful variation canon).)

Experian nonetheless tries to cloak its argument in legitimacy (Br. at 33) by pointing to cases holding that a delegation provision can be severed from a broader arbitration agreement and "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Rent-A-Center*, 561 U.S. at 70. But that principle undercuts Experian's argument. Under *Rent-A-Center*, the delegation provision is no less of a "dispute resolution provision" than the arbitration provision, so it further supports treating the two provisions the same under the "Notice to Existing Customers" carveout, just as the plain language demands.

22

Experian has no other arguments to evade the "Notice to Existing Customers" carveout for Clements. It equates her failure to cancel the free CreditWorks service with her unwritten acceptance of the 2023 Version. (Br. at 30–33.) But even if Experian could establish such unwritten acceptance—and, as explained in section A.3, *infra*, it cannot—the "Notice to Existing Customers" carveout would still block application of the 2023 Version to her, because Clements did not agree in writing to apply the dispute resolution provisions of the 2023 Version to this case, as the carveout requires.

As to Santos, Experian raises an additional counter-textual argument: it claims that his "clickwrap" acceptance of the 2023 Version when he signed up for Boost satisfies the agreement-in-writing requirement of the "Notice to Existing Customers" carveout. (Br. at 29.) The plain language of the provision again says otherwise. Santos was an existing customer of ECS when he signed up for Boost, and the "Notice to Existing Customers" carveout was included in the 2023 terms through which Santos clicked, so it remains applicable to him, regardless of his clickwrap acceptance.

23

And contrary to Experian's suggestion, the carveout requires more than Santos's "agree[ment] to new arbitration and delegation terms in writing." (Br. at 29.) The carveout does not say that the modifications apply to pending litigation once a consumer merely accepts the terms in writing. It says the opposite: the modifications "*shall not* apply" to a currently pending lawsuit "[u]nless the parties agree in writing." (A235 (emphasis added).)

In context, that language requires a specific, written agreement *to apply* the modified dispute-resolution provisions to a pending lawsuit— a distinct, written agreement that goes beyond one side's mere acceptance of the larger contract. If generic acceptance of the larger agreement were enough, the carveout for pending lawsuits would serve no purpose at all—an impermissible result when interpreting a contract—because every written (or clicked) acceptance would automatically satisfy it. *See People's Tr. Ins. Co. v. Lamolli*, 352 So. 3d 890, 895 (Fla. 4th DCA 2022) ("[R]ules of construction require that no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it[.]") (citation omitted); *Dear v. Q Club Hotel, LLC*, 933

24

F.3d 1286, 1293 (11th Cir. 2019) (applying surplusage canon); Scalia & Garner, *Reading Law* 174 (surplusage canon).

Indeed, Experian's reading would require replacing "[u]nless the parties agree in writing," with "unless you accept *this* agreement in writing," another impermissible approach to contract interpretation. *See KRG Oldsmar Project Co., LLC v. CWI, Inc.*, 358 So. 3d 464, 468 (Fla. 2d DCA 2023) ("When a contract is clear and unambiguous, the court's role is to enforce the contract as written, not to rewrite the contract to make it more reasonable for one of the parties."). The only reading that gives effect to every word, and thus the only permissible reading, is that the revised dispute resolution provisions apply prospectively, but do not govern already pending lawsuits unless the parties separately memorialize in writing their agreement to apply those modifications to that pending case. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 941 (Fla. 1979) ("Every provision in a contract should be given meaning and effect and apparent inconsistencies reconciled if possible.").[5]

---

[5] As the district court recognized, to the extent there is any ambiguity in this provision, "that ambiguity works against [Experian]," because ambiguous terms are construed against the drafter, and Experian cannot

The "Amendments" section of the 2021 Version also supports this reading. Like the "Notice to Existing Customers" carveout, the "Amendments" section starts with a default rule providing that "[e]ach time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." (A188.) But it then creates an exception for pending litigation, providing that "no unilateral amendment will retroactively modify the parties' agreed-to dispute resolution provisions of this Agreement for then-pending disputes, unless the parties expressly agree otherwise in writing." (*Id.*) This language makes clear that modifications to the dispute resolution provisions cannot apply to a pending dispute without an "express[]" agreement among the parties to apply the modifications "retroactively." (*Id.*) That, of course, did not happen here.

In response, Experian claims that the "Amendments" section does not apply to Santos, because it only prohibits unilateral modifications,

meet its burden if the delegation clause's applicability remains ambiguous. (A376 n.6 (citing *Arriaga v. Fla. Pac. Farm, L.L.C.*, 305 F.3d 1228, 1247–48 (11th Cir. 2002))). Experian fails to address this point in its brief.

26

and Santos entered into a "new, bilateral agreement" when he signed up for Boost. (Br. at 28.) But that reading again clashes with the agreement's plain language and governing rules of construction.

Under Experian's interpretation, there are no such things as "unilateral amendments," both because Florida law, as it acknowledges, does not recognize unilateral modifications (Br. at 18 (citing *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200–01 (Fla. 2d DCA 2012)), and because, in its view, every customer who does not cancel his or her membership accepts the modifications, removing their unilaterality. So, in Experian's reading, the "unilateral amendment" exception has no meaning or effect, contrary to Florida rules of construction.

The better reading is that "unilateral amendments," instead of referring to nothing, refers to the introductory language of the section that "[t]his Agreement may be updated from time to time." (A188.) The section is structured to distinguish between accepting or agreeing to such updates—which occurs when a service is ordered or used and is what Santos did when he signed up for Boost—and an express agreement to apply the modified dispute resolution provisions retroactively—which

27

never occurred. *See Craig v. Discover Bank*, No. 21-CV-1407, 2022 WL 2119125, at *3 (S.D. Cal. June 13, 2022) (construing the same provision).

Boost is merely a "feature within the membership," and there is a single Experian Terms of Use Agreement that governs CreditWorks and Boost alike. (Doc.270-1 at 75:22–77:7, 78:22–80:2.) So, when Santos, who first enrolled in CreditWorks in February 2021, signed up for Boost in June 2023, he "order[ed] . . . any of the Services" and thereby accepted the updated 2023 Version. (A188.) But he did not enter into a "new, bilateral agreement" with Experian, as it now claims (Br. at 28), or "expressly agree" to "retroactively modify the parties' agreed-to dispute resolution provisions," as the Amendments section requires (A188). The screen that he clicked simply does not say that. (A176 ¶ 6.) So, the Amendments section, like the "Notice to Existing Customers" carveout, precludes applying the 2023 Version to Santos.

## 2. Eleventh Circuit Precedent on Mid-Litigation Court-Evicting Provisions Makes the 2023 Version Inoperative.

Even if the plain language of the agreement did not disable the 2023 Version, Eleventh Circuit precedent on mid-litigation court-evicting

provisions would. This Court's decision in *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014), is directly on point.

In *Dasher*, 882 F.3d at 1019, the plaintiff sued RBC Bank to recover overdraft fees. While the litigation was pending, PNC Bank acquired RBC and issued a 2012 account agreement which was silent on arbitration. *Id.* at 1020. In early 2013, PNC sent plaintiff and other account holders an amended account agreement inserting an arbitration provision. *Id.* at 1020. In the written communication sent to plaintiff, the amendment purported to become effective February 1, 2013 and "indicate[d] PNC deems account holders to accept the amendment if the account holders fail to opt out and continue to use their accounts." *Id.* PNC did not direct the proposed February 2013 amendment to plaintiff's counsel or the court during the window of time PNC designated for its account holders to opt out. *Id.* The plaintiff neither opted out nor ceased using his account. *Id.* Almost 2 years later, in December 2014, PNC moved to compel arbitration based on the February 2013 amendment, and the district court denied the motion. *Id.* at 1020–21.

This Court affirmed the denial because "PNC failed to demonstrate the requisite meeting of the minds to support a finding that the parties

29

agreed through the February 2013 amendment to arbitrate their then-pending litigation." *Id.* at 1021. Explaining the "two related reasons" for reaching this holding, this Court stated:

> First, PNC distributed the proposed, purportedly retroactive and litigation-ending amendment directly to Dasher, even though PNC knew Dasher was an adverse litigant actively represented by counsel as to the very issues raised in the amendment. Second, at the time Dasher failed to opt out of the proposed amendment, he was forcefully and consistently resisting arbitration of the pending litigation.

*Id.* at 1021–22. The Court further stated that, in this context, it "cannot overlook PNC's failure to direct its purportedly court-evicting proposed amendment through known litigation counsel." *Id.* at 1022. Therefore, the Court concluded that PNC "cannot show that Dasher accepted the addition of the arbitration provision, in general, or that he agreed specifically that the arbitration provision could apply retroactively to evict his pending action from court." *Id.* at 1023.

The circumstances of this case are materially indistinguishable from *Dasher*. Experian unilaterally proposed the April 3, 2023 update to the CreditWorks agreement in a communication sent directly to Clements. (A180 ¶ 14.) And it sent Santos a marketing email on June 2,

2023 (Doc.270-1 at 99:19–100:10; Doc.270-9), which likely led him to sign up for Boost the same day (A176 ¶ 6). Although Experian knew—since July 2019—that Plaintiffs were represented by counsel, it did not direct either email to Plaintiffs' counsel or the court during the window of time Experian designated for its account holders to opt out. And, just as in *Dasher*, Plaintiffs' "counseled actions [] clearly and simultaneously evinced an ongoing resistance to arbitration." *Dasher*, 882 F.3d at 1023.

The fact that Plaintiffs' uncounseled and counseled actions "were irreconcilably in conflict with one another" renders Experian unable to demonstrate assent.[6] *Id.* at 1023. "Any communication [from Plaintiffs] must be understood in context, not viewed in the abstract. In this context, the risks of communicating directly with the opposing party as to a purportedly court-evicting amendment outside the presence of opposing counsel are manifest." *Id.* Thus, even if the terms of the 2023 Version did not make it inoperative, this Court should rule that it has no effect under *Dasher*.

---

[6] The fact that the *Dasher* court applied North Carolina law—the law of the state where plaintiff filed his claim—does not render that case any less relevant. *See, e.g.*, *Dasher*, 882 F.3d at 1023. There is "nothing unorthodox in [North Carolina's] analysis of contract law." *Id.*

Contrary to Experian's view, *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119 (11th Cir. 2010), and *Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017), do not allow it to enforce the 2023 Version. Those cases involved independent, plaintiff-initiated conduct that reflected a separate agreement with the defendant. Experian can point to not such conduct from Clements. And as explained above, Santos's agreement to sign up for its Boost feature was not Plaintiff-initiated.

### 3.    Clements Never Accepted the 2023 Version.

Given the two reasons for not applying the 2023 Version discussed above, there is no need to decide whether Clements accepted the 2023 Version. But Experian is wrong in claiming that she did.

Experian's representative testified that Experian had no evidence that Clements opened any of the emails that it sent her after April 3, 2023, including the email announcing the change in terms. (Doc.270-1 at 51–53, 80–81; Doc.270-3 at EXP-Santos 004906.) So, it resorts to claiming that spamming Clements's email address somehow amounts to her continued "use" of Experian's services. That position borders on the absurd. While Experian expansively defines the term "Services" in its agreement, it does not have the power or even attempt to redefine the

32

word "use." No meaningful definition of the word "use" can equate it with receiving but not opening emails, particularly when Experian presented no evidence that Clements even saw the email, or that the email made it to her inbox, as opposed, for example, to her spam folder. *See* "Use," Meriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/use ("to put into action or service; avail oneself of"); (Doc.270-1 at 82:12–19).

Nor can Experian find support for its position in Florida law. Even in so-called browsewrap agreements, where websites present terms but visitors are not required to click through a consent, courts have asked whether the notice is "conspicuous enough to put a reasonably prudent person on inquiry notice." *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2017). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Id.* (quotations omitted). Mutual assent remains the touchstone of contract formation. *Id.* And mutual assent cannot exist where a party does not have reasonable notice that an offer is at hand. Here, again, there is no evidence that Clements ever saw or

33

had notice of the 2023 Version. And without reasonable notice of the offer, mutual assent is impossible.

In addition, even in the browsewrap context, courts still require evidence of an affirmative act manifesting assent. In *MetroPCS Communications, Inc. v. Porter*, 273 So. 3d 1025 (Fla. 3d DCA 2018), for example, the plaintiff "admitted he saw the messages" with hyperlinks to an arbitration agreement, and after receiving those messages, he continued to use and pay for a cell-phone line. *Id.* at 1029. Both elements are missing here. There is no evidence that Clements saw a message with updated terms, and Clements did not take any affirmative steps to use Experian's products after the email was sent, unlike the plaintiff in *MetroPCS*, who kept using and paying for a cell-phone line. So, Experian cannot demonstrate that Clements is bound by the 2023 Version.

### B.    The Operative 2021 Version Did Not Delegate Questions of Litigation-Conduct Waiver to the Arbitrator.

In *Lamonaco*, this Court held that "waiver is *presumptively* a question for the courts," but this "default" rule can be overcome "when the parties agree to delegate waiver issues to the arbitrator" with a "clear and unmistakable" delegation clause. *Lamonaco*, 141 F.4th at 1349

(quotations omitted; emphasis in original). The "clear and unmistakable" standard was met in *Lamonaco*, because the 2023 Version—applicable there because, unlike here, the plaintiff did not dispute its validity—expressly delegates the question of "whether you or [Experian], through litigation conduct or otherwise, waived the right to arbitrate." 141 F. 4th at 1348–49. This Court specifically referenced that language to find the "unmistakable" prong satisfied. *Id.* at 1348. The 2021 Version, in contrast, lacks such language or any reference to waiver.

The failure of the 2021 Version to expressly reference litigation-conduct waiver prevents it from satisfying the "clear and unmistakable" standard for delegating such a question to an arbitrator. Numerous circuit courts have reached this conclusion when presented with indistinguishable delegation clauses. *See In Re Chrysler Pacifica Fire Recall Products Liab. Litig.*, 143 F.4th 718, 723 (6th Cir. 2025) ("Here, although the clauses at issue broadly delegate to arbitration all disputes over the sales contracts' 'validity,' 'enforceability,' 'scope,' and 'arbitrability,' they do not cover gateway questions such as waiver through inconsistent litigation conduct."); *Vine v. PLS Fin. Services, Inc.*, 689 Fed. Appx. 800, 803–04 (5th Cir. 2017) ("Here, we do not find 'clear

35

and unmistakable evidence' that the parties intended to arbitrate litigation-conduct waiver. Though the parties' agreement requires arbitration of 'any claim or attempt to set aside this Arbitration Provision,' it does not explicitly mention litigation-conduct waiver.") (citations omitted); *Morgan Stanley & Co. LLC v. Couch*, 659 Fed. Appx. 402, 404–05 (9th Cir. 2016) ("The arbitration clause at issue in this case states that 'any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.' This language, requiring that the arbitrability of individual *issues* or *claims* be resolved by the arbitrator, does not encompass disputes over whether the clause remains valid in light of the parties' litigation conduct.") (emphasis in original); *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 222 (3d Cir. 2007) (holding that delegation clause covering "[a]ll claims or matters arising out of or relating in any fashion to this Agreement," including "*the issue of arbitrability of any claim or dispute,*" did not "evince[] a clear and unmistakable intent to have an arbitrator decide procedural questions of arbitrability that arise only after the parties have bypassed a gateway determination of substantive arbitrability by the arbitrator and actively litigated the underlying

36

dispute in court," because "[t]here are no references to waiver of arbitration in this or any other provision of the Agreement") (emphasis in original); *Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 15 (1st Cir. 2005) (holding that presumption against delegation was not overcome with clause delegating "any and all disputes," including "*the arbitrability of any such controversy or claim*," because "[t]here are no references to waiver or similar terms anywhere in the arbitration agreement" and "[n]either party should be forced to arbitrate the issue of waiver by conduct without a clearer indication in the agreement that they have agreed to do so").

This Court aligned itself with the weight of this authority in an unpublished decision, *Plaintiff's Shareholders*, 486 Fed. Appx. at 790.[7] In

---

[7] Of the numerous district court decisions addressing the issue, the vast majority require an explicit reference to litigation-conduct waiver and reject Experian's position. *See, e.g.*, *In re Key West Jet Ski, Inc.* No. 4:25-CV-10067, 2026 WL 747112, at *3 (S.D. Fla. Mar. 17, 2026); *McCullough v. MHMR of Tarrany Cty.*, No. 4:25-CV-00901, 2026 WL 856672, at *5 (N.D. Tex. Mar. 5, 2026), *report and recommendation adopted*, No. 4:25-CV-00901, 2026 WL 855843 (N.D. Tex. Mar. 27, 2026); *Perry v. Exeter Fin. LLC*, No. CV-25-01552, 2026 WL 538300, at *12 (D. Ariz. Feb. 26, 2026); *N-Bar Trade, Inc. v. Amazon.com Services LLC*, 807 F. Supp. 3d 11, 21 n.3 (D.D.C. 2025); *Myers v. Papa Texas, LLC*, 749 F. Supp. 3d 1165, 1177 (D.N.M. 2024); *Buruk v. Experian Info. Sols., Inc.*, 732 F. Supp. 3d 165, 170-71 (D. Mass. 2024); *Liu v. Equifax Info. Servs., LLC*, No. 22-cv-10638, 2024 WL 308089, at *6 (D. Mass. Jan. 26, 2024); *Slaten v.*

that case, the defendant argued, just like Experian does here (Br. at 25), that the "incorporation of the rules of the American Arbitration Association, and specifically Rule 7(a), evinces a clear intent" to delegate questions regarding litigation-waiver conduct to an arbitrator. *Id.* at 789. This Court rejected that argument, concluding that the "clear and unmistakable" standard is not met when "'[t]here are no references to waiver or similar terms anywhere in the arbitration agreement.'" *Id.* at 790 (quoting *Marie*, 402 F.3d at 15).

Indeed, to our knowledge, no precedential decision from any circuit court has held litigation-conduct-waiver questions to be delegated to an arbitrator without an explicit reference to litigation-conduct waiver in the agreement.[8] The only appellate decision that Experian cites on the

---

*Experian Info. Sols., Inc.*, No. 21-cv-09045, 2023 WL 6890757, at *2–5 (C.D. Cal. Sept. 6, 2023); *Smith v. Experian Info. Sols., Inc.*, No. 22-cv-06471, 2023 WL 6057377, at *4 (D.N.J. Sept. 14, 2023); *Coronel v. Bank of America, N.A.*, No. 19-cv-8492, 2022 WL 3443985, at *3–4 (D.N.J. Aug. 17, 2022).

[8] The Tenth Circuit's decision in *Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1190 (10th Cir. 2021), is not to the contrary, because the parties in that case agreed "that waiver is a question of arbitrability reserved for a court," so the Tenth Circuit's pronouncement on the issue, with limited analysis, was dicta, at best.

issue is unpublished, *Hilton v. Midland Funding, LLC*, 687 Fed. Appx. 515, 519 (6th Cir. 2017). In that case, the arbitration provision specified that the parties could arbitrate "the validity or enforceability[ ] of this arbitration clause." *Id.* The Sixth Circuit relied on a passage in *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–84 (2002), mentioning waiver to conclude that the delegation provision's reference to enforceability covered waiver. *Hilton*, 687 Fed. Appx. At 519.

But *Hilton* should not guide this Court for two reasons. First, this Court has rejected the reading of *Howsam* upon which *Hilton* relies. *See Grigsby & Associates, Inc. v. M Sec. Inv.*, 664 F.3d 1350, 1354 (11th Cir. 2011) ("We do not understand *Howsam*, which involved no allegations of waiver, to override our approach in those earlier decisions [regarding litigation-conduct waiver]."). This Court, agreeing with the Third Circuit, "treated *Howsam*'s use of the term 'waiver' as referring not to conduct-based waiver, but to a 'defense[] arising from non-compliance with contractual conditions precedent to arbitration.'" *Id.* at 1353 (quoting *Ehleiter*, 482 F.3d at 219).

Second, the Sixth Circuit itself reached the opposite conclusion in a published decision, reasoning that a delegation provision that referenced

39

"validity," "enforceability," "scope," *and* "arbitrability"—that is, an even broader, more inclusive delegation provision than the one in *Hilton* or the 2021 Version here—did "not cover gateway questions such as waiver through inconsistent litigation conduct." *Chrysler Pacifica*, 143 F.4th at 723. As the Sixth Circuit reasoned in its published decision, references to "validity and enforceability" do not suffice because they "address contract-formation disputes, such as whether an agreement was fraudulently induced or is unconscionable"; "scope refers to which claims the arbitration agreement covers"; and a "lone reference" to arbitrability "falls well short of the clear and unmistakable language needed for [the defendant] to overcome the presumption of judicial resolution." *Id.*

The Sixth Circuit's reasoning in *Chrysler Pacifica*, as well as the Third Circuit's decision in *Ehleiter*, 482 F.3d at 222, and the First Circuit's decision in *Marie*, 402 F.3d at 15, undercuts Experian's effort (Br. at 23–25) to seek refuge in authorities addressing the delegation of "arbitrability" issues. *See, e.g.*, *Attix v. Carrington Mortgage Services, LLC*, 35 F.4th 1284, 1298 (11th Cir. 2022); *JPay, Inc. v. Kobel*, 904 F.3d 923, 930 (11th Cir. 2018). The delegation provisions in *Chrysler Pacifica*, *Ehleiter*, and *Marie* all expressly encompassed "arbitrability," but in all

40

three cases, the courts held that the "clear and unmistakable" standard was not met because litigation-conduct cannot be categorized as an issue of "arbitrability," particularly without an express reference to waiver. *Chrysler Pacifica*, 143 F.4th at 723; *Ehleiter*, 482 F.3d at 222; *Marie*, 402 F.3d at 15.

Those decisions are in line with how the term "arbitrability" has been used by this Court and the Supreme Court, neither of which have equated the term with "waiver by litigation conduct." As the following examples demonstrate, this Court and the Supreme Court have used the term "arbitrability" to mean whether a dispute falls within the scope of a broader arbitration clause or whether the arbitration clause is valid, not whether a party's conduct in court resulted in waiving or defaulting on the right to proceed in arbitration, regardless of whether a claim might otherwise be subject to arbitration.

- *Coinbase,* 602 U.S. at 148, defined "arbitrability" as "whether a dispute is subject to arbitration."

- *Henry Schein*, 586 U.S. at 65, described the "threshold arbitrability question" as "whether their arbitration agreement applies to the particular dispute."

41

- *Rent-A-Center*, 561 U.S. at 68–69, defined arbitrability questions as "whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."

- *Howsam*, 537 U.S. at 84, referred to "a gateway dispute about whether the parties are bound by a given arbitration clause" and "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" as "question[s] of arbitrability."

- *Terminix International Co., LP v. Palmer Ranch Ltd. Partnership*, 432 F.3d 1327, 1333 (11th Cir. 2005), addressed "the validity of the remedial restrictions" in an arbitration agreement.

- *Attix*, 35 F.4th at 1302, concerned the "arbitrability" issue of "whether the parties' agreement to arbitrate [the plaintiff's] claims is enforceable under the Dodd-Frank Act."

None of these issues resembles whether a party, through substantial conduct *in court*, waived or defaulted in proceeding with arbitration. *See Marie*, 402 F.3d at 15 (reasoning that arbitrability's "most obvious meaning focuses on certain substantive issues, and

42

particularly the question of whether a particular kind of dispute at issue falls within the scope of the arbitration clause"). Each "arbitrability" issue concerned questions about the arbitration agreement itself—*e.g.*, its scope, applicability, enforceability, or validity—or the internal procedures for arbitration. Those issues are different in kind from questions about the legal consequences of courtroom conduct, which "implicate[] courts' authority to control judicial procedures or to resolve issues . . . arising from judicial conduct." *Ehleiter*, 482 F.3d at 219. "Where the alleged waiver arises out of conduct within the very same litigation in which the party attempts to compel arbitration or stay proceedings, then the district court has power to control the course of proceedings before it and to correct abuses of those proceedings." *Marie*, 402 F.3d at 13.

To be sure, the "clear and unmistakable" standard that this Court applied in *Lamonaco* is also used in authorities addressing the delegation of "threshold arbitrability issues" to an arbitrator. *Lamonaco*, 141 F.4th at 1349 (citing *Attix*, 35 F.4th at 1295; *Terminix*, 432 F.3d at 1332–33). But the source of the presumption that "clear and unmistakable" evidence must overcome is not the same.

43

The arbitrability cases recognize a presumption in favor of courts deciding such threshold issues, because the question of arbitrability delegation "is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers." *First Options*, 514 U.S. at 945. The presumption against delegating arbitrability, thus, flows from "the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," for without the presumption, courts "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *Id.*; *accord JPay,* 904 F.3d at 929 (reasoning that questions of arbitrability "are presumptively for the courts because, as the Supreme Court put it, they are 'rather arcane,' and because we cannot presume they crossed the parties' minds") (quoting *First Options*, 514 U.S. at 945).

The presumption in favor of courts deciding questions of litigation-conduct waiver, however, finds additional support elsewhere. In *Grigsby*, 664 F.3d at 1354, this Court endorsed the presumption because it "leaves the waiver issue to the decisionmaker with greater expertise in recognizing and controlling abusive forum-shopping," and "aligns with

44

this Court's history of adjudicating conduct-based waiver claims." *Id.* at 1354. A court's inherent authority to "control[] abusive forum-shopping," *id.*, and "prevent litigants from abusing the judicial process" and engaging in "outcome-oriented gamesmanship played on the court and the opposing party's dime," *Gutierrez*, 889 F.3d at 1236, animate both the presumption in favor of courts deciding questions of litigation-conduct waiver and the waiver doctrine itself. These additional concerns, unique to litigation-conduct waiver, explain why it is not appropriately grouped together with other threshold arbitrability issues, even it borrows the "clear and unmistakable" standard to overcome the presumption.

Experian's additional arguments for delegation lack merit. Experian, for example, wildly misstates the law in claiming that the 2021 Version "is consistent with similar language that this Court has held sufficient to delegate questions of waiver to an arbitrator." (Br. at 19.) In reality, no case that Experian cites in the ensuing footnote involves delegation of "questions of waiver to an arbitrator." *See Jones*, 866 F.3d at 1271 (involving "gateway issues concerning the interpretation, applicability, enforceability, and formation of the arbitration agreement," not waiver); *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir.

45

2015) (delegation of arbitrability issues, including whether "arbitration provision was unconscionable," not waiver); *Martinez v. Carnival Corp.*, 744 F.3d 1240, 1246 (11th Cir. 2014) (delegation of "whether the Agreement had terminated," not wavier); *In re Checking Account Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1255 (11th Cir. 2012) (delegation of whether "claims are within the scope of the arbitration agreement," not waiver).

Experian also erroneously relies on the *expressio unius est exclusion alterius* canon (Br. at 21–22), that is, "expressing one item of an associated group or series excludes another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (quotation marks and alterations omitted). "The force of any negative implication," the Supreme Court has explained, "depends on context." *Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013); *see* Scalia & Garner, Reading Law 107 (emphasizing that the doctrine "must be applied with great caution, since its application depends so much on context"). The context of the exception in the 2021 Version—the availability of mass or class arbitration—suggests nothing about the status of litigation-conduct waiver. Class arbitration and litigation-conduct waiver are not typical

46

bedfellows or in an "associated group or series," so listing one without the other does not give rise to any inference of exclusion. *N.L.R.B.*, 580 U.S. at 302. And "[s]ingling out one" exception "generally does not imply anything about other, unaddressed conflicts, much less that they should be resolved in the *opposite* manner." *Id.* (emphasis in original). The *expressio unius* canon is simply inapplicable here.

In contrast, the *noscitur a sociis* canon—a word is known by the company it keeps—is a better fit and further undercuts Experian's position. *See Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."). Even when a general term is followed by the word "include" or "including" and an inexhaustive list of examples, the examples work to define the breadth of the general term and what it "does not encompass." *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010); *see In re Piazza*, 719 F.3d 1253, 1263 n.4 (11th Cir. 2013) ("[W]hen general language, such as 'including,' precedes specific examples, the appropriate

47

canon of statutory construction is *noscitur a sociis* or the associated-words canon.").[9]

Applied here, the canon supports construing the general phrase, "[a]ll issues," in light of the specific examples that follow, such as "the scope and enforceability of this arbitration provision." (A193.) The examples concern issues relating to contractual interpretation, formation, and validity, and thus would extend to disputes involving, for example, claims of unconscionability or fraudulent inducement. But those "issues" are "different in kind" from questions of litigation-conduct waiver, which involves the real-time evaluation of what is occurring in court in that particular proceeding. *See Marie*, 402 F.3d at 14. The *noscitur a sociis* canon, thus, provides additional support for the Court's determination of questions of litigation-conduct waiver here.

Finally, Experian overstates the significance of the reference to "[a]ll issues" in the delegation provision. (Br. at 20.) The delegation

---

[9] *See Carraway v. Armour & Co.*, 156 So.2d 494, 495 (Fla. 1963) ("[G]eneral and specific words which are capable of an analogous meaning being associated together take color from each other, so that the general words are restricted to a sense analogous to the less general.") (quotations omitted).

provisions in *Chrysler Pacifica*, 143 F.4th at 723, *Vine*, 689 Fed. Appx. at 803–04, *Couch*, 659 Fed. Appx. at 404–05, *Ehleiter*, 482 F.3d at 222, and *Marie*, 402 F.3d at 15, used just as expansive language, and the courts uniformly held that such agreements lacked clear and unmistakable evidence delegating the litigation-conduct-waiver question to an arbitrator because the provisions did not reference waiver. In fact, Experian itself acknowledged this reality less than a year ago, in response to a petition for rehearing in *Lamonaco*: it said a contract providing that "all disputes shall be resolved by arbitration" "is not enough to overcome the presumption in any circuit." Experian Resp. to Pet. for Rehearing at 11, *Lamonaco v. Experian Information Solutions, Inc.*, No. 24-11270 (11th Cir. filed Aug. 18, 2025) (hereinafter "Experian Resp. to Pet.") (alterations omitted).

The same reasoning applies here. The term "issues," read in context, does not encompass questions of litigation-conduct waiver, so modifying it with the word "all" does not accomplish what Experian urges. *Cf. Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80 (1998) (holding that the "clear and unmistakable" standard was not satisfied for

a broad arbitration provision applying to "[m]atters under dispute" because it could be construed more narrowly in context).

Experian now tries to dismiss this approach as imposing a "magic words" requirement. (Br. at 21.) But it comports with recent Supreme Court authority construing arbitration agreements. Among the central "benefits of private dispute resolution," the Supreme Court has recognized, are "lower costs [and] greater efficiency and speed." *Stolt-Nielsen*, 559 U.S. at 685. Permitting a party to litigate for years in court, running up massive expenses "on the court and the opposing party's dime," and then to divert the dispute to arbitration only when that party starts losing in court would obviously undermine these central benefits. *Gutierrez*, 889 F.3d at 1236. The Supreme Court has required more than "silence" or "ambiguity" to generate such a result: "Neither silence nor ambiguity provides a sufficient basis for concluding that parties to an arbitration agreement agreed to undermine the central benefits of arbitration itself." *Lamps Plus,* 587 U.S. at 186.

The 2021 Version did not overcome the presumption in favor of courts deciding questions of litigation-conduct waiver, so the district court properly made the decision.

50

**C.    The Text of the FAA Requires Courts to Decide Questions of Litigation-Conduct Waiver in This Procedural Posture.**

"[I]n any case of statutory construction, [the Court's] analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well." *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1161 (11th Cir. 2021) (internal quotation marks omitted). This cardinal rule of statutory construction requires the Court to begin with the language of the governing statute, § 3 of the FAA.

> Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, *the court in which such suit is pending*, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial* of the action until such arbitration has been had in accordance with the terms of the agreement, *providing the applicant for the stay is not in default in proceeding with such arbitration.*

9 U.S.C. § 3 (emphasis added). This Court has long used "default" in § 3 interchangeably with "waiver." *Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n (Lux.)*, 62 F.3d 1356, 1365 n.16 (11th Cir. 1995) ("Although the [FAA] uses the term 'default,' the case law on this subject

51

employs the term 'waiver.'") (internal citation omitted)); *accord Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1316 (11th Cir. 2002) ("We have before clarified that the term 'default' carries the same meaning as 'waiver.'"). Indeed, this Court's predecessor highlighted the "default" language of § 3 as the statutory basis for holding that a party had waived its arbitration right. *See E. C. Ernst, Inc. v. Manhattan Constr. Co. of Texas*, 551 F.2d 1026, 1040–41 (5th Cir. 1977) (emphasizing the default language of § 3), *opinion modified on reh'g*, 559 F.2d 268 (5th Cir. 1977).

While this Court recently suggested that some daylight exists between "default" and "waiver" as a doctrinal matter, it reaffirmed that a party is in default under § 3 when it "has acted inconsistently with the arbitration right." *Merritt Island Woodwerx, LLC v. Space Coast Credit Union*, 137 F.4th 1268, 1274 n.1 (11th Cir. 2025) (quotation marks omitted). The Supreme Court clarified that this waiver test, like all procedural rules, must be applied without "devis[ing] novel rules to favor arbitration over litigation." *Morgan*, 596 U.S. at 418.

The question presented here is whether a court must decide this waiver or default issue, or whether the parties may delegate the issue to an arbitrator. The text of § 3 supplies a clear answer. Under the plain

52

language of the statute, a court lacks authority to stay a case for arbitration if the applicant for the stay is "in default in proceeding with such arbitration." 9 U.S.C. § 3. To ascertain its own authority to stay a case under the FAA, then, a court must, of necessity, determine for itself that the applicant is not in default. It is an "antecedent statutory provision[] limit[ing] the scope of the court's powers under §§ 3 and 4." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 110 (2019).

The Seventh Circuit reached the same conclusion based on the text of the FAA: "the proper authority to determine if such default occurred is the courts because the text of the FAA 'expressly gives the *courts* jurisdiction to determine the existence of a default.'" *Al-Nahhas v. 777 Partners LLC*, 129 F.4th 418, 425 (7th Cir. 2025) (quoting *Halcon Int'l, Inc. v. Monsanto Australia Limited*, 446 F.2d 156, 161 (7th Cir. 1971)) (emphasis in original). Other circuits have acknowledged this straightforward implication of § 3, as well. *See Marie*, 402 F.3d at 14 n.10 ("The 'default' language in Section 3 of the FAA, which as we noted includes waiver, perhaps gives courts a duty, which cannot be shifted by contract between the parties, to determine whether waiver has occurred."); *accord Ehleiter*, 482 F.3d at 221 n.13 ("We share the First

Circuit's concern about the enforceability of arbitration agreements that expressly authorize the arbitrator to resolve claims of waiver based on litigation conduct."). Likewise, the Eighth Circuit has unequivocally held that "[c]ourts determine whether a party waives arbitration, not arbitrators." *Breadeaux's Pisa, LLC v. Beckman Bros. Ltd.*, 83 F.4th 1113, 1118–19 (8th Cir. 2023); *accord Sitzer v. Nat'l Ass'n of Realtors*, 12 F.4th 853, 855–56 (8th Cir. 2021).

Of course, in *Lamonaco*, 141 F. 4th at 1349, this Court held that, under *Grigsby*, 664 F.3d at 1353, parties may delegate the question of litigation-conduct waiver to an arbitrator with a clear and unmistakable delegation provision. At first glance, this ruling and the Court's prior-panel rule would appear to block a subsequent panel from concluding that the text of the FAA requires courts to decide questions of litigation-conduct waiver. But this is a unique case, because Experian, in successfully opposing a petition for rehearing in *Lamonaco*, maintained that "nothing in [*Lamonaco*] would stop a subsequent panel from examining whether § 3 prohibits delegation of the issue of waiver by litigation conduct." Experian Resp. to Pet. at 9. Experian reasoned that the statutory question was never raised in the initial appeal, and

54

Lamonaco had instead relied on *Grigsby*, so "the panel did *not* come to any firm conclusion on the unbriefed issue." *Id.* at 2. Having prevailed in opposing the petition for rehearing, Experian is judicially estopped from adopting the opposite position now. *See Slater v. United States Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017).

Nor does *Grigsby* require a different result. Contrary to the un-litigated premise of the *Lamonaco* parties, *Grigsby* cannot be read as permitting delegation of litigation-conduct-questions upon a § 3 motion because *Grigsby* did not involve a § 3 motion—it arose in a much different procedural posture. After one party initiated arbitration proceedings against the other, the arbitral defendant responded with an action in federal court seeking to enjoin the arbitration on the grounds that the arbitral plaintiff had waived arbitration by previously litigating a separate action. *Grigsby*, 664 F.3d at 1351. The district court declined to enter the injunction, the arbitration resulted in an award against the arbitral defendant, and the district court confirmed the award. *Id.* The *Grigsby* decision, therefore, arose from an appeal of an order confirming an arbitration award, not an order resolving a § 3 motion to stay litigation in favor of arbitration.

55

So, *Grigsby* had no occasion to construe the "default" language in §
3, which governs here. [10] The *Lamonaco* parties erred in relying on
*Grigsby* in this different procedural context and overlooking the plain
language of § 3.

To be sure, the Supreme Court has declined to read a different part
of § 3—requiring that "the court . . . be[] satisfied that the issue involved
. . . is referable to arbitration" under the agreement—as precluding
delegation of "questions of arbitrability," because "the ship has sailed" on
that issue, as the Court "has consistently held that parties may delegate
threshold arbitrability questions to the arbitrator, so long as the parties'
agreement does so by 'clear and unmistakable' evidence." *Henry Schein*,
586 U.S. at 69. But the "default" language is in a different part of § 3 that

---

[10] Sections 2 and 4 of the FAA—the provisions cited in *Lamonaco*, 141
F.4th at 1343, 1346—are also relevant. In general, § 2 establishes the
validity and enforceability of arbitration agreements, 9 U.S.C. § 2, and §
4 allows a party to petition a federal court for an order compelling
arbitration and specifies procedures to resolve disputes about the
formation of, or failure to perform, arbitration agreements, 9 U.S.C. § 4.
But § 3, of course, cannot simply be ignored in favor of § 4, for "[t]he
Supreme Court has cautioned [courts] to interpret sections 3 and 4 of the
FAA together." *Marie*, 402 F.3d at 13 (citing *Prima Paint Corp. v. Flood
& Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967)); *see Sink v. Aden
Enters., Inc.*, 352 F.3d 1197, 1201 (9th Cir. 2003) (recognizing the
"interdependent nature" of sections 3 and 4).

the Court did not address in *Henry Schein* and does not depend on the same "be[] satisfied" language. Rather, it is at the end of § 3 and imposes an independent condition that must be satisfied for the court to stay litigation: a determination that "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

While the Court has "consistently" permitted arbitrators to decide arbitrability issues, there is no consistent line of authority—or any authority at all—from the Supreme Court holding that courts may stay litigation in favor of arbitration under § 3 without first determining for themselves that movant "is not in default," as the statute requires. To the contrary, in *New Prime*, 586 U.S. at 110–12, decided one week after *Henry Schein*, the Court held that a delegation clause could not displace a court's obligation to undertake another "antecedent statutory inquiry," *id.* at 112, that could "limit the scope of the court's powers under §[] 3," *id.* at 110. The same reasoning applies here, but with added force, because questions of litigation-conduct waiver, as discussed throughout the preceding section, implicate unique forum-shopping concerns that other arbitrability issues do not.

Finally, the textual case for requiring courts to make the default determination finds support in § 6 of the FAA and the Supreme Court's most recent decision on litigation-conduct waiver. In directing "a federal court to treat arbitration applications 'in the manner provided by law' for all other motions," the Court explained, § 6 "is simply a command to apply the usual federal procedural rules, including any rules relating to a motion's timeliness." *Morgan*, 596 U.S. at 419 (quoting 9 U.S.C. § 6). As a result, § 6 requires courts to apply "the usual federal rule of waiver" to motions to stay litigation in favor of arbitration, including "that a party, by litigating too long, waived its right to stay litigation or compel arbitration under the FAA." *Id.* So, § 6, as construed in *Morgan*, reinforces the court's essential role in making a waiver or default determination.

Because the plain language of § 3 requires a court to determine for itself whether a party is in default in proceeding with arbitration, this Court should join the Seventh and Eighth Circuits in holding that questions of litigation-conduct waiver, which this Court has long held qualifies as "default" under § 3, must be decided by a court when a party moves to stay litigation under § 3.

58

## II. The District Court Correctly Decided That Experian Waived Its Right To Compel Arbitration.

Experian does not bother to challenge the district court's waiver determination, as it lacks any colorable basis to do so. "Arbitration should not be compelled when the party who seeks to compel arbitration has waived that right." *Morewitz*, 62 F.3d at 1365. A "key factor" in deciding if a party has acted inconsistently with its arbitration right is "whether [that] party has 'substantially invoke[d] the litigation machinery prior to demanding arbitration.'" *Gutierrez*, 889 F.3d at 1236.

As the district court concluded (A383–85), there is no dispute that Experian substantially invoked the litigation machinery prior to demanding arbitration *six years* into this case. Experian's right to arbitrate Clements's claims arose when she enrolled in CreditWorks on July 12, 2019. (A178 ¶ 8.) But Experian elected to litigate in court. Experian moved to dismiss Plaintiffs' claims on the merits (Doc.29); requested a ten-day jury trial (Doc.32); engaged in extensive discovery, including several depositions (Doc.238 at 10); moved for summary judgment (Doc.39); filed an Answer to the Complaint (Doc.46); and participated in mediation (Doc.62).

Santos then enrolled in CreditWorks on February 20, 2021, so Experian gained the right to arbitrate his claims then. (A175 ¶ 3.) But Experian continued to invoke the litigation machinery. It filed a *Daubert* Motion (Doc.90); filed for leave to file a second summary judgment motion (Doc.92); litigated class certification (Doc.125); and filed joint proposed jury instructions (Doc.154), deposition designations (Doc.156), and motions in limine (Doc.159) in preparation for an imminent trial date. After the Parties' January 3, 2022 trial date was rescheduled, on January 10, 2022, Experian filed a Motion for Judgment on the Pleadings, reiterating the same merits arguments it did at summary judgment. (Doc.186.) As the district court found, Experian "fought Plaintiffs' claims on the merits in every way short of trial without once invoking its right to arbitration." (A384.)

Moreover, when Experian prevailed on Plaintiffs' initial motion for class certification, and Plaintiffs took an interlocutory appeal, it continued to litigate in *this* Court in an effort to preserve its initial victory. Even after Experian issued the 2023 Version in April 2023, Experian chose litigation over arbitration. This Court held oral argument in in the interlocutory appeal in May 2023, over a month after Experian

60

purported to modify its agreement. But Experian said nothing to this Court or the district court then. If it had truly wished to arbitrate or believed that the district court lacked jurisdiction at the time to consider a motion to compel arbitration, it could have alerted this Court and moved for an indicative ruling from this Court under Fed. R. Civ. P. 62.1. Of course, with a favorable decision in its pocket at the time, Experian remained silent and elected to try its luck with this Court. Only when that tactic backfired with a reversal did Experian turn to arbitration.

Eleventh Circuit law forbids this gamesmanship. *Gutierrez*, 889 F.3d at 1236 ("The judicial system was not designed to accommodate a defendant who elects to forego arbitration when it believes that the outcome in litigation will be favorable to it, proceeds with extensive discovery and court proceedings, and then suddenly changes course and pursues arbitration when its prospects of victory in litigation dim.").

Experian's participation in the litigation since 2019 and 2021, respectively, is far beyond enough to waive its arbitration rights as to Plaintiffs. *See, e.g., Garcia v. Wachovia Corp.*, 699 F.3d 1273, 1277–78 (11th Cir. 2012) (active participation in discovery for more than a year was inconsistent with the right to arbitrate); *S & H Contractors, Inc. v.*

61

*A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990) (waiting eight months, taking five depositions, and litigating a motion to dismiss and discovery motion supported waiver). As the district court concluded, Experian's decision to request arbitration "shortly after the Eleventh Circuit reversed the [district c]ourt's denial of class certification, after litigating for years, 'smacks of [the] outcome-oriented gamesmanship played on the court and the opposing party[]' that the waiver doctrine is meant to prevent." (A384 (quoting *Gutierrez*, 889 F.3d at 1236).)

Experian nonetheless advanced "a puzzling argument" to the district court that its right to arbitration arose from the 2023 Version, so its pre-2023 conduct should be irrelevant. (A383.) For good reason, Experian does not advance, and thus waives, that argument on appeal. As the district court reasoned, that "sleight of hand" lacks merit because Experian had the right to arbitrate as early as 2019 for Clements and 2021 for Santos, yet it elected to litigate instead. (*Id.*) Because Plaintiffs never changed their claims, Experian's waived arbitration right could not be revived. *See Dasher*, 882 F.3d at 1025.

Finally, even though it is well-established that a delegation clause "is simply an additional, antecedent agreement the party seeking

arbitration asks the federal court to enforce," and thus is severable from a broader arbitration agreement, *Rent-A-Center*, 561 U.S. at 70, it does not follow that litigating in court for five years waives only the broader right to arbitrate but not the delegation clause, as Experian suggests. Just as the severability principle "does not require a party to challenge *only* the arbitration or delegation provision," *Coinbase*, 602 U.S. at 151, waiver by litigation conduct need not be limited to only the arbitration or delegation provision. Rather, just as "a challenge" may "appl[y] 'equally' to the whole contract and to an arbitration or delegation provision," *id.*, litigation in court for five years may waive an arbitration and delegation clause equally.

After all, litigating in court "establishes a waiver of the defendant's right to compel arbitration" precisely because "such conduct shows, in the normal case, that the defendant intends to elect a judicial forum rather than an arbitral tribunal." *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1203 (11th Cir. 2011). And even though a delegation clause and arbitration agreement are severable, they are not unrelated, for the delegation clause works in service of the arbitration agreement. In other contexts, a waiver of one right waives the related right. *See Montejo v.*

63

*Louisiana*, 556 U.S. 778, 786 (2009) (holding that a waiver of *Miranda* rights, sourced in the Fifth Amendment, can also serve as a waiver of Sixth Amendment right to have counsel present).

Experian cannot reasonably argue that it lacked the opportunity to invoke the delegation clause and thus did not waive it, even after five years of litigation. Experian could have invoked both the arbitration and delegation clauses in 2019 as to Clements and in 2021 as to Santos and had the arbitrator decide every delegable threshold issue then. It chose litigation instead. While the severability principle allows a delegation clause to be enforced even when unrelated challenges are raised to a broader agreement, there remains a single delegation clause here, and the severability principle does not slice it into a fictitious, infinite number of separate clauses for each possible issue.

To be sure, a defendant's litigation against an initial set of claims does not waive its right to arbitrate "later asserted" claims, *Collado v. J. & G. Transp., Inc.*, 820 F.3d 1256, 1260 (11th Cir. 2016), just as litigation against named plaintiffs, when the defendant has given fair, advanced notice at the outset of a case of an intent to arbitrate against a putative class, does not waive the defendant's right to arbitrate upon class

64

certification, *Gutierrez*, 889 F.3d at 1239. But in each case, it is the plaintiff's conduct—asserting new claims or introducing new plaintiffs— that gives the defendant a fresh opportunity to arbitrate. Experian, in contrast, controlled the timing of its request to arbitrate, and nothing in these cases suggests that a defendant may hold back its arbitration rights without waiving them.

A contrary approach effectively nullifies the waiver doctrine. As the Seventh Circuit reasoned, "a party could move for arbitration in the middle of a trial and force the court to pause proceedings until an arbitrator decided if the trial could proceed," *Al-Nahhas*, 129 F.4th at 425, a scenario not far from this case. "The FAA could not have intended such a bizarre result." *Id*.

This Court should curb the potential for such abuse and affirm on the additional ground that litigation generally waives the right to arbitrate both the merits of a claim and threshold issues. Although the district court did not reach this issue, this Court "may affirm on any basis in the record, even if the district court did not actually rely on that basis."

65

*Davis v. Legal Services Alabama, Inc.*, 19 F.4th 1261, 1268 (11th Cir. 2021).[11]

## CONCLUSION

For the foregoing reasons, the district court's order should be affirmed. In addition, because Experian has no colorable basis to dispute that it has waived its arbitration rights, regardless of whether a court or arbitrator makes the decision, this Court should follow the recommendation in *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 744 (2023), to impose sanctions on Experian for taking advantage of the immediate appeal and automatic stay provisions of the FAA to needlessly delayed and increased expense in this matter.

---

[11] This issue was not addressed or decided in *Lamonaco*, 141 F.4th at 1349.

Dated: April 6, 2026                          Respectfully submitted,


                                              */s/ Matthew P. Weinshall*
                                              Peter Prieto
                                              Matthew P. Weinshall
                                              PODHURST ORSECK, P.A.
                                              2525 Ponce de Leon, Suite 700
                                              Coral Gables, Florida 33134
                                              Tel.: 305-358-2800
                                              Fax: 305-358-2382
                                              pprieto@podhurst.com
                                              mweinshall@podhurst.com

                                              Roland Tellis
                                              rtellis@baronbudd.com
                                              Adam M. Tamburelli
                                              atamburelli@baronbudd.com
                                              Baron & Budd, P.C.
                                              15910 Ventura Boulevard
                                              Suite 1600
                                              Encino, California 91436

                                              Dennis McCarty
                                              dennismccartylaw@gmail.com
                                              Jonathan Raburn
                                              jonathan@geauxlaw.com
                                              McCARTY & RABURN PLLC
                                              2931 Ridge Road, Suite 101 #504
                                              Rockwall, Texas 75032


          *Counsel for Plaintiffs-Appellees, Omar Santos, et al.*

67

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiffs/Appellees hereby certifies that the type style utilized in this brief is 14-point Century Schoolbook proportionally spaced, and there are 12,996 words in the brief.

*/s/ Matthew P. Weinshall*
Matthew P. Weinshall

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 6, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

/s/ Matthew P. Weinshall
Matthew P. Weinshall

68